**Ellis WOOD, owner and master of THE Oil Screw SAMPAN, Libellant,**

v.

**VILLAGE OF NORTHPORT, Respondent.**

No. 20675.

United States District Court
E. D. New York.

Sept. 1, 1960.

Purdy, Lamb & Catoggio, New York City, for libellant, by Edmund F. Lamb, New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for respondent, by John C. Hart, New York City, of counsel.

BYERS, District Judge.

This cause arises from the sinking of the Sampan on February 17, 1958 while tied up to a timber pier in Northport Harbor owned by the Village of Northport, Long Island. The individual respondents named in the original libel, and the later impleaded respondent Cochrane, were dismissed from the cause on consent, at the conclusion of the trial.

The fact of sinking is not in dispute; the cause thereof, and the question of liability, are the matters requiring decision.

The libel was filed May 1, 1958 and the Fourth Article charges "fault, negligence, and careless, reckless, wilful and wanton conduct" on the part of the Village because it dumped many tons of snow on the ice that filled the slip in which the Sampan lay, with actual knowledge that "tremendous pressures" were thereby applied to the hull of the Sampan, and after actual notice thereof and demand that it be ceased, that no action was taken by the Village to prevent the sinking and complete loss of the Sampan.

This in substance is the burden of proof undertaken by libellant.

The relevant facts are not in dispute and may be thus related:

The timber pier is built upon open spiles, and projects in a westerly direction and is in the shape of a "T". It

is 20 feet in width and extends for a distance of about 64 feet to about the center of a cross element which runs generally north and south. That is 18 feet in width and about 119 feet long. On the southerly side of the first element there is thus created a slip of about 98 feet, by 64 feet, by 99 feet; the latter is the length of a bulkhead running along the shore front and parallel to the southerly section of the cross-piece of the "T". The open end of the slip is its southerly side measuring 58.8 feet.

Libellant's Exhibit 1 is a chart upon which the foregoing is shown.

■ It should be said at once that this pier is not a wharf in the commercial sense, and the Village is not a wharfinger with respect to it. This is a finding.

The libellant made the Sampan fast at the head of this slip alongside the pier, by lines leading thereto, sometime in October 1957, intending thus to lay up his vessel, a fishing oil screw, for the winter, and to enable him to do some work on the engines and to couple up and render operative a 650 pound winch which was then unattached to the vessel in any respect, but was standing on the deck, apparently unlashed to any cleat or rail. That is a matter to be referred to later.

The libellant did not seek permission to tie up his vessel from any official of the Village or otherwise, and relied upon acquiescence in his so doing, upon the fact, as he testified, that no one "chased him away".

■ By way of comment it may be said that his legal status is difficult to define, but is thought to be similar to that of a squatter upon land, who is suffered so to remain with the knowledge of the owner. He could have been thought of as a trespasser when first he tied up his vessel, but since the Village must be deemed to have acquiesced for over three months in the use that he made of this pier, such forbearance must somewhat mitigate the terminology to be employed.

If the Sampan be regarded as a kind of maritime mendicant, taking gratu-itous haven without permission, it seems none the less true that she enjoyed immunity from the infliction by the Village of wanton, i. e., calculated, intentional injury, as she lay in the position stated.

Since no survey was held by libellant, it is a fair inference that his vessel was not covered by hull insurance, and thus the loss became wholly his, which is an appealing circumstance, if true; but liability is not to be visited for that reason upon the Village, i. e., the taxpayers, but only if the burden of proof, according to the allegations of the libel, can be found to have been sustained.

The evidence shows that the Sampan lay in the position stated, with her port side against a vertical ladder which was made fast to the easterly side of this part of the pier, as shown in Libellant's Exhibit 2. She carried two automobile tire fenders on that side, but they did not serve to prevent a certain rubbing against that ladder, about amidships of the vessel.

Alongside to starboard lay the fishing schooner Java Head, whose lines ran forward to the pier (not across the Sampan). That vessel had assumed her own berth some time in December; her port side was held away from the Sampan by a rope fender, as shown in that exhibit, and an automobile tire on the starboard side of the Sampan.

These were both wooden vessels, of these dimensions:

| Sampan | 36 feet by 10 feet 3 inches with a 5.2 foot depth; |
| Java Head | 40 feet by 12 feet with a depth of 7 feet. |

It is not possible to state accurately the depth of the water where these vessels lay, since no soundings are in evidence. There seems to be a general agreement that at mean low water there was a depth of about 3 to 3½ feet where the Sampan lay, and that the bottom was muddy. This means that at mean low water, and less, the Sampan was aground, but whether that was true for her entire length cannot be stated.

Since the head of the slip was at least 64 feet wide, it results that there was about 42 feet of open water to starboard of the Java Head, at all times here involved, as no vessel was moved in that part of the slip.

For ten days or so, beginning February 8, 1958, the temperature had been below freezing, so that on February 17th these vessels were held in a solid surface of ice that extended throughout the slip. No one was able to testify to its thickness, but the figure of at least four inches seems to have been accepted by both sides.

The testimony of libellant was uncontradicted that the average rise and fall of the tide was 7 feet, which would affect the surface of the ice, either to cause it to rise and fall, or to produce and release vertical pressure upon the under side of that surface.

Unfortunately there is no testimony as to this important aspect of the case, and speculation upon it is less than profitable.

The importance of that observation will appear.

On February 15 and 16 there was a heavy fall of snow, to a depth of about 14 inches in the Village and the countryside. That required clearing the highways of snow by the use of trucks and equipment; the contents of the trucks was dumped from the bulkhead opposite these vessels; that was started around noontime on February 17. The libellant fixes the time at 10:00 a. m. but Salamida's testimony is preferred as better informed, and he places it at 12:00 o'clock, noon.

During the ensuing twelve hours, several trucks dumped snow from the bulkhead onto the ice surface of the slip, operating on a front of about 40 feet. In all it is estimated by the Village's expert that about 9,000 cubic feet were so dumped, and his figures were not contested by opposing testimony.

The snow pile of course was triangular, if viewed in section, and the base constituted the distance that the pile extended out from the bulkhead. Part of the pile is shown in Libellant's Exhibits 2 and 3, from which it is clear that the snow itself did not extend to the starboard side of the Java Head by some 15 feet or so. This means that pressure by the snow itself against the latter vessel is not urged as a cause of the heeling by Sampan to her own port, and against the pier where the ladder was in the position stated.

The libellant argues that such a result ensued, and explains the mechanics of the situation in his brief as follows (p. 16):

"* * * the listing of the Java Head to starboard * * * can only be explained by lateral pressure against the hull of the Java Head below her waterline with the ice at the waterline acting as a fulcrum. The only cause of such lateral pressure inferable from the proof and according with the physical facts is the displacement by the snow piled on top of it of the ice immediately under the snow out *under* the ice which was waterborne and not depressed by the snowpile." (Italics supplied.)

This seems to mean that the ice under the pile of snow assumed a lower level than the ice beyond, which bore no snow; that the ice that supported snow was forced by the weight of it under the ice in which the Java Head and Sampan were cradled; that the Java Head heeled to starboard and thus caused the Sampan to heel to port. If the argument is indeed understood, it is not supported by Libellant's Exhibits 2 and 3 taken on February 18, which show a flat surface of ice, not two levels, to the starboard side of the Java Head. It is true that Respondent's Exhibit A, taken on February 19, shows fissures in the exposed surface of that section of the ice, but nothing to indicate an underriding of the portion that was free of snow, by that portion which carried snow.

Since the sinking of the Sampan is fixed at around or later than 10:00 p.m. on February 17—in other words, in the

dark of the night—the difficulty of demonstrating libellant's cause will be the more apparent. It is asserted for him that an undersurface lateral pressure was created by the continuance of the snow dumping operation after he had protested against it to Peterson, then the Assistant Superintendent of Highways of the Village. It should be assumed that he made such a protest, although both sides seemed to have carefully refrained from asking Peterson about it when he was on the stand; but libellant does not say that he called attention to any subsurface pressure or condition, but merely to his belief that the snow dumping threatened harm to his vessel. Whether he was right about that is open to serious doubt at least, but in any case it seems to fall short as a matter of law, of demonstrating that the continuance of snow dumping was in the nature of wanton or calculated injury within the requirement as heretofore stated. At most its effect was so questionable, and concealed a thing in the dark of night, that the Village could not be held to have been wanton in continuing its snow removal operation merely because libellant stated that it was harming his vessel. A better and more convincing showing was required of him, in order to put a denial of his request (if such be assumed) into the category of wantonness, than an assertion which even in the light of all that was developed at the trial was merely argumentative, speculative, and certainly not obviously justified.

Although not strictly required to account for the mishap, the Village offered expert testimony by William Finkenauer, whose qualifications were conceded as a marine surveyor and consulting engineer. He made a survey on May 29, 1958 of the Sampan, after she had been pumped out by the Village, and towed to a place where she was beached in shallow water.

He observed that she showed no hull damage, such as would result from her having been squeezed on the night of February 17 when the sinking occurred.

On that testimony, which was uncontested and not impaired on cross-examination, the court so finds.

The witness gave it as his opinion, based on all the testimony at the trial which he heard, that Sampan's listing to port could have been caused by the shifting further to port of the winch above referred to, from its stated position on deck about two or three feet to port of the center of the Sampan (beam 10 ft. 3 in. as stated). That the heeling of the vessel was either caused or enhanced by the opening of a freeing port at deck level, which admitted water to the hull of a vessel already heeled, which probably was related to a catching at the foot of the ladder already referred to, that contributed to, if it did not cause, the heavy list to port.

It is true that the foot of the ladder would not be so exposed as to engage any part of the port side of the Sampan, unless there was an unusually low tide. Under such conditions the foot of the ladder would be as much as eight inches above the surface of the water, which on that night was frozen. There was a low tide during the hours of the night, but there is no testimony that the foot of the ladder was exposed during that interval. However, the ladder itself was received in evidence (subject to a motion to strike which was not made) and clearly reveals splintering and rubbing in the lower parts, which would be consistent with the kind of contact between it and the Sampan, which formed an important element in Mr. Finkenauer's observations and conclusions.

Sight has not been lost of the libellant's early testimony that he tied up his vessel four feet away from the pier; perhaps he did. The abrasions on the ladder however were not made by an object that distance from the pier on the night in question.

While no finding on the subject is deemed to be required, the court is clearly of the opinion that Mr. Finkenauer's analysis of the situation is far more persuasive than libellant's theoretical argument which has been quoted; the effect

of this expert opinion is to render the libellant's cause more deficient in demonstration than it would otherwise have been.

It is concluded that for libellant's failure to sustain the burden of proof, the libel must be dismissed on the merits, but without costs.

Settle decree on five days' notice, with additional findings if such are deemed requisite.